2019 UT App 193

# THE UTAH COURT OF APPEALS

STATE OF UTAH,
Appellee,
*v.*
SETH GORDON PETERSON,
Appellant.

Opinion
No. 20180369-CA
Filed November 29, 2019

Seventh District Court, Price Department
The Honorable George M. Harmond
No. 161700479

Robert A. Oliver, Attorney for Appellant

Sean D. Reyes and Lindsey L. Wheeler, Attorneys
for Appellee

JUDGE KATE APPLEBY authored this Opinion, in which
JUDGES MICHELE M. CHRISTIANSEN FORSTER and JILL M. POHLMAN
concurred.

APPLEBY, Judge:

¶1     Seth Gordon Peterson killed his mother (Mother) and brother (Brother) and appeals his conviction for the aggravated murder of Brother. Peterson presented a voluntary intoxication defense at trial claiming he did not intentionally kill Mother or Brother because he had experienced psychosis from methamphetamine use and therefore could be convicted only of manslaughter for each killing. He contends the jury accepted this defense as to Mother but not Brother and therefore reached an inconsistent verdict. We affirm.

BACKGROUND

¶2    Peterson lived on a farm in central Utah with his two uncles. They used methamphetamine together "religiously every day." Peterson denied using methamphetamine the day of the killings, but later claimed he did and suffered from methamphetamine psychosis.

¶3    The day before the homicides, Peterson and one of his uncles (Uncle C) drove to Salt Lake City, Utah to purchase drugs. During the drive Uncle C said Peterson told him "an entity . . . offered [Peterson] mortality on this earth if [he] were to offer up one of [his] brothers' limbs or lives" and that Brother was "a leader of all demons." Uncle C asked Peterson if he told the entity "no," but Peterson did not respond. The next morning on their way home, Peterson told Uncle C he did not want to use drugs anymore and asked for help.

¶4    Once they arrived home, Peterson was "clearly disturbed" and "very upset." He told his other uncle (Uncle J) that he would kill Brother that day. Peterson then told Uncle J about the "entity" who told him "he would receive the ultimate power" if he killed Brother.

¶5    Later that day, Peterson called 911. He told the dispatcher that he felt like his "life [was] in danger" and that he needed help immediately. The dispatcher asked if anyone had a weapon or had taken any drugs, and Peterson told her there were weapons. When asked whether the weapon was a gun, Peterson refused to answer any additional questions. The dispatcher told Peterson she needed to make sure the responding officers were safe, and he told her that "they may not be." He insisted he needed assistance but never told the dispatcher what was wrong. In the background of the call, Peterson can be heard telling Uncle J he called the police because he did not feel safe and he was scared for his life. Uncle J told Peterson he was

acting "insane," and in response, Peterson attempted to "cancel" the 911 call because everything was "alright." The dispatcher told Peterson she could not cancel the call. Peterson hung up on her.

¶6 Police officers responded to the residence and Uncle J informed them that Peterson intended to "kill [Brother] that day." An officer spoke with Peterson, who was showing signs of "obvious paranoia" but not intoxication. The officer reported that Peterson came "back to reality quite a few times and he was calm" and overall was "very nice" and "cordial." The officer repeatedly asked Peterson if he had been using methamphetamine, and Peterson denied doing so. The officers unloaded all the guns on the property, including Peterson's and Uncle C's rifles. They contacted Mother, and she agreed to come over to look after Peterson. The officers left the house and Mother and Brother arrived about forty minutes later.

¶7 When Mother and Brother arrived, Peterson greeted them as if "everything was normal." Soon after they arrived, Uncle C decided to go look for a wounded deer he saw on the farm. Mother and Peterson went with him, while Brother and Uncle J remained at the house. Peterson watched Uncle C load his rifle and then got his own rifle.

¶8 Uncle C, Mother, and Peterson left on an all-terrain vehicle to go look for the deer. They drove to a field and separated to look for it. Uncle C went one way while Mother and Peterson went another. Uncle C overheard the other two briefly argue. Mother tried to take Peterson's rifle, but he pushed her away. Next, Uncle C heard Peterson yell, "[N]o you're not" followed by the sound of a gunshot and a "horrifying scream." Uncle C saw Mother running down the hill with her face "all red." He heard Mother "making a noise . . . like her larynx had gotten blown out." She "squeal[ed] . . . like a pig"

and Peterson made a similar noise while "laughing" and "mocking" her.

¶9 Uncle C approached Mother and noticed her "face was . . . gone." He yelled to Peterson, "[W]hat did you do to your mom?" to which Peterson responded, "I shot her in the fucking face." Next, Uncle C saw Brother driving toward them, but his truck got stuck in a ditch near Mother. Peterson reloaded his rifle and shot Mother in the back. Peterson then approached Brother, who was sitting in the truck, and shot him in the face. Peterson pulled Brother's body from the truck and drove the truck out of the ditch. He returned to Brother's body, rifled through Brother's pockets, took twenty dollars, and left the body in the ditch. Peterson then fled in the truck.

¶10 Peterson returned to the house and encountered the owner (Owner) of the farm. Peterson calmly explained that he needed help burying "two bodies" and that he "just killed two demons." Owner told Peterson he would help if Peterson gave him his gun. Owner's cellphone rang, startling Peterson, who pointed his rifle at Owner's chest and "motion[ed] towards the trigger." Owner grabbed the rifle and hit Peterson with it. Peterson ran to Owner's truck and retrieved a crowbar. Owner called 911 and put the phone in his pocket as Peterson lunged at him with the crowbar. Peterson struck Owner with the crowbar "eight to fifteen times," and Owner thought Peterson was "trying to kill" him. Peterson eventually "got tired" and drove off.

¶11 The first officers to arrive at the scene saw Peterson driving erratically down the street. The officers tried to pull Peterson over, but he kept driving, which triggered a high-speed chase. Peterson was driving "very fast," weaving in and out of lanes. He threw glassware, a backpack, and a duffel bag out the truck window. Eventually he veered off the road and crashed.

He ran up a hill, but was pursued by officers who caught and arrested him.

¶12    Shortly after his arrest, Peterson admitted he "killed [his] family." He was transported to a hospital where he claimed he used methamphetamine that day.[1] He was later released from the hospital and booked into jail.

¶13    Peterson spoke to several family members the next day. They believed Peterson's drug use caused him to kill Mother and Brother. One of his brothers told him "[R]emember in your legal defense, that, you know, you had no clue, like you honestly thought [Mother and Brother] were the devil . . . because you can claim insanity, not that you are insane right now, but when you were on drugs . . . it does that to you sometimes."

¶14    The next day, a detective (Detective) interviewed Peterson. Peterson told Detective he had been using methamphetamine prior to and on the day of the homicides. He said he had not slept for four days before the homicides. Peterson explained that while he was buying drugs in Salt Lake City he began experiencing hallucinations and felt he was being followed. He said it may have just been "paranoia from using the drug" or it "may have been something else." Peterson told Detective that on the return drive from Salt Lake City he felt "paranoid" about police "and other people" following them and felt his life was in danger before they reached home. Once back at the house, he called the police because he still felt "unsafe."

¶15    Peterson explained that once Mother and Brother arrived, they "didn't seem like they were themselves," as if they were "artificial bodies with artificial minds." He explained Mother tried to help him calm down but he saw her "face deform"; at

---

1. Peterson's blood tested positive for amphetamines.

that point he knew she was "an artificial intelligence" and he "had to destroy her" and Brother "because they were both [S]atan." Peterson explained, "And so I shot her." He said she screamed "and it sounded like a demon," which confirmed he had done the right thing.

¶16    Next, Peterson explained that Brother appeared a short time later but did not seem like himself so he shot Brother too. He told Detective that he "didn't feel like he gave [Brother] much of a chance." He stated that he had a brief exchange of words with Brother and asked him who he was. Brother responded, "Well, I'm your brother who you grew up with," and then Peterson shot him. Peterson explained he stole the twenty dollars from Brother because he knew Brother "wouldn't need it [since] he was dead."

¶17    Peterson was charged with attempted aggravated murder, aggravated robbery, failure to respond to an officer's signal, and two counts of aggravated murder. At the close of the State's evidence at trial, Peterson moved for a directed verdict, arguing insufficient evidence supported finding that he acted intentionally and knowingly when he killed Mother and Brother. The court denied the motion.

¶18    Peterson's theory at trial was that he committed the murders while experiencing methamphetamine psychosis and therefore could be convicted only of manslaughter—not aggravated murder. He called a mental health counselor as an expert witness who described the possible side-effects of using methamphetamine, including methamphetamine psychosis. The counselor testified that visual hallucinations are rare when one is under the influence of methamphetamine, but if they occur, they are usually "very fleeting" and unclear. For example, an individual might see a human's face distort into a dog's face and then back to a human's within a short time. The counselor

concluded methamphetamine psychosis is rare but could affect a person's ability to form mens rea.[2]

¶19 Uncle J testified that Peterson was not himself on the day of the killings. He explained that Peterson had "a feeling of wanting to kill [Brother] in the past" and had been fighting that feeling. Uncle C testified he believed Peterson was "possessed" on the day in question, but also that Peterson "knew what he was doing."

¶20 The jury found Peterson guilty of aggravated murder for killing Brother and manslaughter for killing Mother.[3] After trial, Peterson moved to arrest judgment on the aggravated murder conviction. He argued that the aggravated murder conviction was inconsistent with the manslaughter conviction. He contended the jury "was convinced that [Peterson] was voluntarily intoxicated when he killed [Mother], but not convinced that [Peterson] was voluntarily intoxicated when he killed [Brother]." And because the killings happened so close in time, the verdict did not make sense and should be set aside. The district court denied the motion, explaining that a claim of inconsistency alone is insufficient to overturn a verdict and that Peterson did not make a showing of an additional error to overturn it. The court concluded there was no evidence to show the jury committed an error and sufficient evidence supported the convictions.

---

2. Mens rea is "[t]he state of mind that the prosecution, to secure a conviction, must prove that a defendant had when committing a crime." *Mens rea*, Black's Law Dictionary (11th ed. 2010).

3. The jury also found him guilty of attempted aggravated murder, aggravated robbery, and failure to respond to an officer's command, but Peterson does not appeal these convictions.

¶21 The district court sentenced Peterson to one to fifteen years in prison for the manslaughter conviction and twenty-five years to life for the aggravated murder conviction, ordering each sentence to run concurrently.[4] Peterson appeals.

## ISSUE AND STANDARD OF REVIEW

¶22 Peterson argues the district court erred in denying his motion to arrest judgment after the jury reached an allegedly inconsistent verdict. We review inconsistency challenges to jury verdicts "in the light most favorable to the verdict and will not overturn a jury's verdict of criminal conviction unless reasonable minds could not rationally have arrived at a verdict of guilty beyond a reasonable doubt based on the law and on the evidence presented." *State v. LoPrinzi*, 2014 UT App 256, ¶ 11, 338 P.3d 253 (quotation simplified).

## ANALYSIS

¶23 Peterson argues the district court erred in denying his motion to arrest judgment after the jury reached an allegedly inconsistent verdict. He contends the jury could not reasonably convict him of aggravated murder for killing Brother when it presumably believed his voluntary intoxication defense and convicted him of manslaughter for killing Mother. He argues the verdict was unreasonable because of the short time interval between the killings.

---

4. He was also sentenced to six years to life on the attempted aggravated murder conviction, five years to life for the aggravated robbery conviction, and zero to five years for his failure to respond to an officer's command conviction.

¶24    This court will not reverse a conviction on an inconsistent verdict challenge unless "reasonable minds could not rationally have arrived at the verdict of guilty beyond a reasonable doubt based on the law and on the evidence presented." *State v. LoPrinzi*, 2014 UT App 256, ¶ 30, 338 P.3d 253 (quotation simplified). In other words, "so long as sufficient evidence supports each of the guilty verdicts, state courts generally have upheld the convictions." *State v. Cady*, 2018 UT App 8, ¶ 32, 414 P.3d 974 (quotation simplified). This is "because appellate courts have always resisted inquiring into the jury's thought processes and deliberations," *id.* (quotation simplified), and have recognized that a jury may have arrived at an inconsistent verdict "through mistake, compromise, or lenity," *LoPrinzi*, 2014 UT App 256, ¶ 30 (quotation simplified).

¶25    Although we can conceive of several scenarios under which the verdicts were not inconsistent, we assume without deciding that the aggravated murder conviction for killing Brother and the manslaughter conviction for killing Mother are inconsistent. But we conclude sufficient evidence supports the aggravated murder conviction.[5]

¶26    Peterson claims insufficient evidence supports the jury's verdict finding that he "intentionally or knowingly" caused Brother's death. Utah Code Ann. § 76-5-202(1) (LexisNexis Supp. 2019). Peterson also advanced a voluntary intoxication defense, which required the jury to decide whether his methamphetamine use created reasonable doubt as to whether he intentionally or knowingly killed Mother and Brother. Utah Code Ann. § 76-2-306 (2017). Ample evidence supports the theory that Peterson acted intentionally and knowingly when he killed Brother and that he was not "so intoxicated that he was

---

5. Peterson does not challenge the sufficiency of the evidence for his manslaughter conviction.

incapable of forming the requisite mental state for [aggravated murder]." *Honie v. State*, 2014 UT 19, ¶ 50, 342 P.3d 182.

¶27 For example, Peterson disclosed to several people before the killings that he wanted to kill Brother. Specifically, he told his uncles that "entities" offered him "ultimate power" if he killed Brother. This evidence demonstrates that Peterson formed the intent to kill Brother prior to the killings.

¶28 Also, the rifle Peterson used required him to "lift the bolt, pull it back, push it forward, and then lower the bolt" each time he fired. Peterson shot Mother twice, once in the face and once in the back to "end her suffering," and he said he knew he was killing a human when he shot Mother the second time. Peterson then reloaded his rifle and shot Brother in the face at point-blank range. After shooting Brother, Peterson dumped the body out of the truck and tried to drive away, returning to the body to take money from Brother's wallet because, according to him, Brother "wouldn't need it [since] he was dead." This evidence shows not only did enough time elapse between the killings for him to form the requisite intent to kill Brother, but also that he recognized he was killing human beings.

¶29 Finally, Peterson drove away in the truck and fled from the police. When he was arrested, one of the first statements he made was "I killed my family." Regardless of the weight the jury may have given his voluntary intoxication defense, we conclude "some evidence exists" from which the jury could determine Peterson intentionally or knowingly killed Brother. *State v. Montoya*, 2004 UT 5, ¶ 29, 84 P.3d 1183 (quotation simplified). As Peterson's own expert testified, hallucinating from methamphetamine is "rare" and when it does occur, it is typically short-lived and the hallucinations are not vivid or clear.

¶30 We conclude the above, taken together, is sufficient evidence to support Peterson's aggravated murder conviction.

*See Neff v. Neff*, 2011 UT 6, ¶ 49, 247 P.3d 380 ("[W]ith regard to a claim that a jury verdict is internally inconsistent, we resolve any inconsistency in favor of giving effect to a jury verdict.").

## CONCLUSION

¶31    The district court did not err in denying Peterson's motion to arrest judgment because sufficient evidence supports his aggravated murder conviction for killing Brother. Accordingly, we affirm.

————————